UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
NICK PAPASPIRIDAKOS,

                Plaintiff,

        - against -

EDUCATION AFFILIATES, INC.,

                Defendant.
------------------------------------------------------------ x

**MEMORANDUM & ORDER**

10 CV 5628 (RJD) (JO)

DEARIE, District Judge.

      Plaintiff, a former nursing student at St. Paul's School of Nursing ("St. Paul's"), brings this action against Education Affiliates, Inc., the corporation that took ownership of the school during his enrollment. In the wake of his suspension, plaintiff seeks damages for breach of contract, complaining about the school's facilities, the faculty, and the administration of the school under its new leadership. He also brings a claim for deceptive trade practices, arguing that the school misrepresented its accreditation and affiliation with a national nursing organization. Defendant moves for summary judgment under Federal Rule of Civil Procedure 56.

      For the reasons that follow, defendant's motion for summary judgment is granted. Several of plaintiff's claims are unsupported by the record. The remaining claims are backed predominantly by plaintiff's own testimony, which is largely conclusory and does not support the weight of his assertions. Plaintiff's breach of contract claim would also require this Court to second-guess the informed opinion of the New York State Department of Education, which found that plaintiff's claims about the quality of education at St. Paul's lack merit. We decline to do so.

# I. BACKGROUND[1]

## A. The Parties

Plaintiff Nick Papaspiridakos is a resident of Queens, New York. ECF Docket # 55, Defendant's Local Rule 56.1 Statement ("Def. R. 56.1") ¶ 1. In March 2009, he was accepted to the two-year Associate's degree program at Saint Vincent Catholic Center's School of Nursing ("St. Vincent"). Id. ¶ 2. Plaintiff applied to St. Vincent after his wife graduated from the program in 2007. Id. ¶ 7.

By the time plaintiff began attending classes in September 2009, St. Vincent had been renamed St. Paul's. Def. R. 56.1 ¶ 9. The name change was sparked by the takeover of defendant Education Affiliates, Inc. ("EA"), a Baltimore, Maryland-based corporation. Id. ¶ 2. St. Vincent selected EA to take over the school's operation, with approval from the State Board of Regents, after the school was financially unable to continue in 2006. Id. ¶ 3. Since assuming control, EA has "spent several million dollars to subsidize operating losses, upgrade the educational infrastructure, and support expanded enrollment." Id. ¶ 4. St. Paul's also retained many of the same senior educators "in an effort to maintain continuity." Id.

## B. Plaintiff's Conflict with St. Paul's

Plaintiff argues that he "noticed several material problems with the new school" during his brief time there. ECF Docket # 50, Plaintiff's Memorandum of Law ("Plaintiff Mem.") at 2. Specifically, he complains about the adequacy of laboratory facilities, the quality and performance of the faculty, the efficacy of student evaluations, and faculty non-compliance with set hours of instruction and office hours. Plaintiff Mem. at 8-12.

---

[1] Plaintiff has not responded to Defendant's Rule 56.1 Statement. Accordingly, the facts set forth in that statement are deemed admitted for the purposes of this motion. See Local Rule 56.1; Gubitosi v. Kapica, 154 F.3d 30, 31 n.1 (2d Cir. 1998).

Plaintiff's dissatisfaction with St. Paul's came to a head during his second semester, when a series of conflicts with a faculty member lead to his temporary suspension. Def. R. 56.1 ¶¶ 15-17. Plaintiff had been struggling in one of his classes, and on March 16, 2010, he met with his professor to "dispute" one of the answers to a recent exam question. Plaintiff Mem. at 3; Def. R. 56.1 ¶ 12. When the professor informed plaintiff that he was using an outdated version of the textbook, plaintiff became visibly agitated and loud, and requested a meeting with the professor and the Director of Nursing. Def. R. 56.1 ¶ 12. When the professor declined, plaintiff proceeded to the Director's office, where he had to be asked to lower his voice. Id. ¶ 13. Plaintiff approached his professor again later that afternoon, this time in front of two other faculty members. Id. ¶ 14. The conversation was similarly unavailing; plaintiff admits that he remained "frustrated" and "got loud." Id.

Within a few days of his suspension, plaintiff was permitted to return to school on the condition that he attends an anger management program. Id. ¶¶ 15-17. Plaintiff refused the school's remedial option and chose to remain suspended from the program. Id. He maintains that he was wrongfully dismissed, mistreated and "vilified" by St. Paul's and Education Affiliates because of his efforts to address the school's issues. Compl. ¶ 13, 38.

### C. Procedural History

On May 22, 2010, plaintiff submitted a formal complaint to the New York State Education Department, Office of Professions ("NYSED"), the governing body for nursing education institutions in New York. Def. R. 56.1 ¶ 18. Following an investigation of the complaint, the NYSED concluded that plaintiff had been afforded due process and that his complaints about the quality of St. Paul's nursing education were without merit. Id. ¶ 21.

On December 6, 2010, plaintiff commenced this lawsuit seeking damages under two claims. First, plaintiff alleges breach of contract based on promises set forth in the St. Paul's School of Nursing's Student Handbook for 2009-2010 ("Handbook") and the St. Paul's School of Nursing's 2010 Catalog ("Catalog"). Plaintiff brings a second claim for deceptive trade practices pursuant to New York General Business Law ("NY GBL") § 349 with respect to the school's public representations about its affiliation with and accreditation by the National League of Nursing ("NLN").

## II. DISCUSSION

### A. Subject Matter Jurisdiction

As an initial matter, this Court lacks subject matter jurisdiction over any claim that plaintiff was improperly dismissed from St. Paul's. Such a challenge to a school's administrative decision would be properly brought within four months in a state Article 78 proceeding. See New York Civil Practice Law and Rules ("N.Y. C.P.L.R.") §§ 217(1), 7801 (McKinney 2013) ("Relief previously obtained by writs of certiorari to review, mandamus or prohibition shall be obtained in a proceeding under this article"); Gally v. Columbia Univ., 22 F.Supp.2d 199, 205 (S.D.N.Y. 1998) ("Proceedings under Article 78 are typically the avenue for parties challenging administrative actions by government agencies or by the decision-making bodies of private entities."). Because plaintiff does not seek to compel any action by Defendant, and instead seeks monetary damages for breach of contract and deceptive business practices, plaintiff's action is properly before this Court.

Defendant argues that plaintiff merely "couches his claims as claims for breach of contract," but that they must be brought in an Article 78 action because they effectively "challenged the internal administrative and academic determinations" of the school. ECF Docket

4

# 58, Defendant's Reply Memorandum ("Reply Mem.") at 7 (internal quotations omitted). We disagree. Although plaintiff references his suspension as evidence of the school's animus towards him, he does not directly challenge St. Paul's decision in this action. And while plaintiff's suspension may have been the impetus for this lawsuit, the fact that he was suspended does not preclude him from bringing a separate suit for breach of contract and deceptive practices.[2] See Alexson v. Hudson Valley Cmty. Coll., 125 F.Supp.2d 27, 29 (N.D.N.Y. 2000) (permitting student to bring action for breach of contract and deceptive trade practices after his alleged expulsion).

We have subject matter jurisdiction over these claims on diversity grounds. Fed. R. Civ. P. § 1332 (a).

**B. Summary Judgment**

Summary judgment is appropriate where there is no genuine issue of material fact and ... the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c)(2). "The movant bears the burden of demonstrating the absence of a question of material fact." Moccio v. Cornell Univ., 889 F. Supp. 2d 539, 568 (S.D.N.Y. 2012). "In making this determination, the Court must view all facts in the light most favorable to the non-moving party." Id. (quoting Celotex v. Catrett, 477 U.S. 317, 323 (1986)). "The ultimate inquiry is whether a reasonable jury could find for the nonmoving party based on the evidence presented, the legitimate inferences that could be drawn from the evidence in favor of the nonmoving party, and the applicable burden of proof." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). "However, the non-moving party must offer more than conclusory allegations and unsubstantiated speculation to defeat

---

[2] We note that plaintiff was not required to withdraw from St. Paul's unconditionally, but chose not to comply with the school's conditions for remaining in the program. To that extent, plaintiff's suspension was as much a decision on his part to withdraw.

5

summary judgment; the non-moving party must offer some hard evidence showing that its version of the facts is not wholly fanciful." Shelton v. Trustees of Columbia Univ., 369 Fed. App'x. 200, 201 (2d Cir. 2010). (internal quotations omitted).

### C. Breach of Contract for Specified Services

In the wake of his suspension, plaintiff alleges that the St. Paul's Student Handbook and program Catalog outline several unfulfilled "promises" made by the school, entitling him to damages for breach of contract. Defendant argues that these allegations are non-cognizable claims of educational malpractice.

In New York, the relationship between a university and its students is contractual in nature. Deen v. New School Univ., 2007 WL 1032295 (S.D.N.Y. 2007), at *2. When a prospective student is admitted to a school, an implied contract forms, and the terms of the agreement are "supplied by the bulletins, circulars and regulations made available to the student." Dasrath v. Ross Sch. of Med., 494 Fed. App'x. 177, 178 (2d Cir. 2012) (quoting Gally, 22 F. Supp. 2d at 206). Also implicit in this contract is that the university must act in good faith in dealing with the student, and the student, in turn, must "fulfill [his] end of the bargain by satisfying the university's academic requirements and complying with its procedures . . ." Id. at 178 (internal quotations omitted).

However, "not every dispute between a student and a university is amenable to a breach of contract claim." Gally, 22 F. Supp. at 206. As a matter of public policy, New York courts consistently decline to entertain actions sounding in tort-based "educational malpractice," where "the essence of the complaint is that the school breached its agreement by failing to

provide an effective education."[3] Paladino v. Adelphi Univ., 454 N.Y.S.2d 868 (2d Dep't 1982). This policy recognizes that "professional educators—not judges—are charged with the responsibility for determining the method of learning that should be pursued for their students." Id. at 873. It also acknowledges that schools are subject to oversight by the Department of Education, which sets forth regulations, oversees licensing, and has the power to step in when a school fails to meet its obligations. Id. at 872. "To entertain a cause of action for educational malpractice would require the courts not merely to make judgments as to the validity of broad educational policies . . . but, more importantly, to sit in review of the day-to-day implementation of these policies." Donohue v. Copiague Union Free Sch. Dist, 391 N.E.2d 1352, 1354 (1979). General claims about the quality of an education "are not statements of fact capable of proof, but rather opinions which should not provide a basis for the imposition of liability." Alligood v. Cnty. of Erie, 749 N.Y.S.2d 349 (2002).

Thus, to be successful in a breach of contract claim, a student must not request judicial review of purely academic determinations that would require the Court to evaluate "the course of instruction" or "the soundness of educational methodology." Paladino, 454 N.Y.S.2d at 872-73. A student may, however, bring a claim for failure to provide "certain specified services" for which she has contracted, such as "a designated number of hours of instruction, Id. at 873, or a specific name on her diploma as set forth in the student catalogue, Deen, 2007 WL 1032295, at *3-4. Plaintiff must establish: (1) an agreement; (2) adequate performance by plaintiff, (3) breach by defendant, and (4) damages. Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996).

We address each of plaintiff's allegations below.

---

[3] These public policy concerns are "equally applicable when the action is brought against a private educational institution and is formulated in contract." Andre v. Pace Univ., 655 N.Y.2d 777, 779 (2d Dep't, 1996); Paladino, 454 N.Y.S.2d at 872.

7

1. *Laboratory Equipment*

Plaintiff argues that defendant failed to provide "adequate classroom facilities" and "[l]abs [ ] delivered in equipped laboratories," as promised in the Catalog. Plaintiff Mem. at 8; Pl. Exh. B, Catalog, at 4, 9. However, plaintiff offers no evidentiary support for his assertion. Plaintiff's brief points only to the Amended Complaint, which alleges that "a class of approximately 20 students would be forced to share [four] microscopes," and that the laboratory contained "a solitary plastic skeleton, which was rarely, if ever used." Plaintiff Mem. at 8 (citing ECF Docket # 55, Amended Complaint ("Compl.") ¶ 1). Such unsupported allegations cannot withstand a motion for summary judgment.

Furthermore, plaintiff has not identified any specific promise that students would have their own microscopes or that more than one skeleton is necessary for laboratory instruction. Nor does plaintiff explain how the student-to-microscope and student-to-skeleton ratios were objectively inadequate or deprived him of the benefit of his bargain with the university. See e.g., Gally, 22 F. Supp. 2d at 208, n.8. (noting that plaintiff did not allege that her accusations of rampant cheating among students actually affected her performance). Instead, plaintiff's claim necessarily entails an evaluation of the adequacy and quality of the laboratory facility itself—a task that we are not only ill-equipped to carry out, but would require "judicial displacement of [ ] educational determinations" that are best left to the educational community. Andre, 655 N.Y.S.2d at 780 (finding that the court below "improperly engaged in judicial evaluation of a course of instruction" where it ruled on the suitability of a particular textbook and the effectiveness of the pedagogical method chosen by the professor). Such claims of educational malpractice are not cognizable by this Court.

### 2. *Faculty Quality and Performance*

Plaintiff makes two complaints about the St. Paul's faculty, whom he describes as "disinterested, malicious, [and] intentionally incompetent." Plaintiff Mem. at 11. First, he argues that the school breached its promise to deliver "qualified instructors," as promised in the Catalog. Pl. Ex. B., Catalog, at 9. Second, he complains about the way he was treated by the faculty, suggesting that he was judged and disrespected in violation of standards set forth in the Student Handbook. Pl. Ex. A, Handbook, at 46-47 ("Faculty have the responsibility to recognize and respect students [sic] point of view. Faculty have the responsibility to maintain a non-judgmental environment of academic freedom where both teachers and students have the right to express opinions.").

Notwithstanding the inflammatory, conclusory nature of these allegations, they are also non-cognizable claims of educational malpractice. A school's faculty is the bedrock of any education. We cannot make any assessments about the qualification of educators without rendering a comprehensive judgment of the quality of the education plaintiff received. This is a classic claim of "educational malpractice" that courts in this state properly defer to the New York State Department of Education.

Plaintiff's argument regarding mistreatment by faculty members is similarly unavailing. In support, plaintiff points only to his testimony regarding the events surrounding his suspension, which the New York Department of Education determined was fair and afforded him due process. Because this claim "sounds in [the] tort" of educational malpractice, and essentially "asks the Court to involve itself in the subjective professional judgments of trained educators," it will not survive merely because plaintiff "couches [his] claim in terms of breach of contract."

Gally, 22 F. Supp. 2d at 207-08 (dismissing plaintiff's claim of mistreatment by a professor, which the Court held is "better left to the sound handling of school administrators").

### 3. *Student Evaluations*

Plaintiff also criticizes the school's method of evaluating student performance, complaining that professors would post grades by identification number, and that grades would change without explanation. He also complains that graded quizzes and tests were never returned or shown to students. Pl. Ex. D, Plaintiff Deposition ("Dep.") at 143, 144, 149. His breach of contract claim is premised on language in the Student Handbook, which states: "Faculty have the responsibility to evaluate student performance in an objective manner and use an equitable grading system which is understood by students." Pl. Ex. A, Handbook, at 46-47.

First, the New York State Department of Education investigated plaintiff's claim and found that it lacked merit. But notwithstanding the fact that this claim sounds in educational malpractice, we do not see any evidence of a breach of contract for a specific service. The language does not guarantee that individual students understand other students' grades or changes in those grades, but merely that students understand the grading "system." Nor does it make a specific promise that students are entitled to see their quizzes or exams.

Finally, plaintiff does not explain how he was at all prejudiced by the current system. Although plaintiff claims that he never had quizzes or exams returned to him, he cannot say that the professors never reviewed exam material. For example, he testified about a review session covering three 35 question quizzes, wherein the professor selected an assortment of 20 questions to review with students. Pl. Ex. D, Plaintiff Dep. at 144-45. He also asserts that he was a "model student" with a 3.9 grade point average, making it difficult to see how he has a viable claim for damages.

### 4. *Hours of Instruction*

We also dismiss the following claims regarding hours of instruction because they are unsubstantiated by the record and cannot be considered a material breach of contract. Plaintiff generalizes that professors would leave for 20-30 minutes to make copies of handouts—depriving students of their entitlement to 50 minutes of class instruction per hour, as specified in the Catalog. Pl. Ex. B, Catalog, at 10. While courts have acknowledged that a school's failure to provide "a designated number of hours of instruction" might be the basis for a breach of contract claim, plaintiff does not put forth any substantive evidence that he was deprived of instruction in any meaningful way. Clarke v. Trustees of Columbia Univ., 1996 WL 609271, at *5 (quoting Paladino, 89 A.D.2d at 92). Plaintiff's only support for this allegation is his own testimony that one professor was unprepared and left the class to make copies on "at least two days." Pl. Ex. D, Plaintiff Dep. at 139. No reasonable fact-finder could find a material breach of an implied contract with the school.

Plaintiff's claim regarding the faculty's failure to maintain office hours is also frivolous. Plaintiff Mem. at 8. Again, he cites only one example: a professor who "fail[ed] to appear at *a number* of scheduled office hours." Compl. ¶ 25-26 (emphasis added). Because plaintiff cannot say that office hours were never posted or that the faculty, as a whole, was routinely unavailable to students, this claim cannot withstand defendant's motion for summary judgment.

### D. Deceptive Acts or Practices

Plaintiff also brings a claim for deceptive business practices under Section 349 of New York General Business Law. N.Y. Gen. Bus. L. § 349(a) (McKinney 2013). He argues that by displaying a National League of Nursing ("NLN") plaque at the school, defendant

11

misrepresented St. Paul's as a member of and accredited by NLN. Plaintiff contends that because of the school's lack of membership and accreditation, he is "not able to easily transfer credits to a school" that holds those affiliations. Plaintiff Mem. at 16; Compl. ¶ 49. Plaintiff fails to tender any evidence in support of this allegation.

To succeed on a claim under NY GBL § 349, plaintiff must demonstrate that defendant "has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." City of N.Y. v. Smokes-Spirits.com, Inc., 911 N.E.2d 834, 838 (N.Y. 2009). Under the objective standard of NY GBL § 349, the challenged representation or omission must be one that is "likely to mislead a reasonable consumer acting reasonably under the circumstances." Stutman v. Chemical Bank, 731 N.E.2d 608 (N.Y. 2000).

Plaintiff's claim fails because he cannot, as a matter of law, demonstrate that defendant's actions were materially misleading. First, NLN is not an accrediting organization, but a professional organization that offers membership for a fee. Pl. Ex., Expert Report of Janet Mackin, at 12. We find no evidence in the record that plaintiff's misunderstanding was the result of any deception on defendant's part. Furthermore, the plaque in question states that St. Vincent was a "member" of NLN in 2000, which is true. On that basis, no reasonable juror could find it materially misleading.

We also agree with defendant that plaintiff lacks standing to bring this claim. Defendant Mem. at 18-19; Smoke-Spirits.com, Inc., 911 N.E.2d at 838. By his own admission, plaintiff did not even see the plaque in question until after his suspension. Nor does he make any

assertion that he was indirectly misled by others who had seen it or by any independent research that he conducted.[4]

Plaintiff's other complaints also fail to state a claim under NY GBL § 349. Plaintiff makes the same arguments raised under his breach of contract claim, suggesting that these grievances are also compensable under NY GBL. Plaintiff Mem. at 16. For the reasons cited above, we find no evidence that any representations about the quality of the school or facilities were materially misleading. Furthermore, plaintiff's grievances with the financial aid department fail because they are not supported by the record before this Court.[5]

### III. CONCLUSION

For all of the foregoing reasons, defendant's motion for summary judgment is granted.

SO ORDERED.

Dated: Brooklyn, New York
September 11, 2013

/s/ Judge Raymond J. Dearie

_____
RAYMOND J. DEARIE
United States District Judge

---

[4] Plaintiff testified that other than speaking with his wife, he did not do additional research on St. Paul's prior to commencing his education in September of 2009. Defendant Mem. at 9.
[5] Beyond allegations in the Amended Complaint and one tuition billing statement documenting a correction made by the school, plaintiff offers no evidence supporting his claim. Nor does plaintiff explain how the school's conduct was "consumer-oriented" or "materially misleading," as opposed to mere mismanagement of plaintiff's unique account.

13